UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JACKIE CORBETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:07-CV-00100 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Jackie Corbett appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

### I. PROCEDURAL HISTORY

Corbett applied for SSI on June 6, 2003, alleging that he became disabled as of May 16, 2003. (Tr. 44-47.) The Commissioner denied his application initially and upon reconsideration, and Corbett requested an administrative hearing. (Tr. 28-43.) On January 6, 2006, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Corbett, who was not represented by counsel, and a vocational expert ("VE") testified. (Tr. 334-60.)

On September 14, 2006, the ALJ rendered an unfavorable decision to Corbett, concluding

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

that he was not disabled despite the limitations caused by his impairments because he could perform a significant number of jobs in the national economy. (Tr. 10-20.) Corbett then obtained counsel to represent him and requested that the Appeals Council review the ALJ's decision. (Tr. 6.) The Appeals Council denied Corbett's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3-6.) Corbett filed a complaint with this Court on April 30, 2007, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. CORBETT'S ARGUMENTS

Corbett alleges three flaws with the Commissioner's final decision. Specifically, Corbett claims that (1) his waiver of counsel was invalid and that the ALJ failed to fully and fairly develop the record; (2) the ALJ improperly evaluated the opinion of Dr. Kennedy, an examining physician; and (3) the ALJ erred by failing to ask the VE whether his testimony was consistent with the U.S. Department of Labor's *Dictionary of Occupational Titles* ("DOT"). (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 8-11.)

## III. FACTUAL BACKGROUND[2]

*A. Background*

At the time of the ALJ's decision, Corbett was fifty-four years old, had a high school education, and possessed work experience as a construction worker and contractor. (Tr. 54-55, 58, 60-61, 83, 340, 342, 347, 350.) Corbett states that he is disabled due to asthma, obesity, cardiomegaly, and post debridement excision of necrotic tissue and drainage of abscess on the penis and scrotum. (Opening Br. 2.)

---

[2] The administrative record in this case is voluminous (360 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

2

At the time of the hearing, Corbett stated that he lives alone in a trailer and drives a car. (Tr. 355.)  He performs most of his home care independently, but does seek assistance with heavy lifting and with tasks that involve the use of chemicals. (Tr. 356.)  When asked why he stopped working, Corbett replied that he "had asthma and [he] wasn't able to breathe and function and do [his] job." (Tr. 341.)  He further explained that he was having headaches as a result of his asthma and that he would "just have to lay down and sleep." (Tr. 342; *see also* Tr. 348.)  Corbett admitted, however, that once he started receiving medical treatment for his asthma in 2001 or 2002, his headaches became less frequent. (Tr. 348-49.)

Corbett reported that he was 5'10" or 5'11" in height and weighed 406 pounds at the time of the hearing and that he was participating in a weight-management program at the Veterans Administration Hospital (the "VA"). (Tr. 350.)  He also stated that he takes medication for high blood pressure and that he experiences swelling in his legs every day, which causes him to lie down in the afternoon. (Tr. 352-54.)  When asked about his physical capacity, Corbett stated that he could walk approximately two blocks before experiencing problems; he further confided that he has difficulty with bending because of his obesity and that he is fearful of heights. (Tr. 352, 355.)

### B.  *Summary of the Medical Evidence*

In May 2003, Corbett was treated at Marion General Hospital for an abscess on his scrotum and penis. (Tr. 88.)  Dr. George Geier surgically drained the abscess and excised the necrotic tissue. (Tr. 88-91.)  During his hospitalization, Corbett experienced complications with respect to his renal, respiratory, and cardiac systems. (Tr. 114-17, 120-21.)  A chest x-ray revealed cardiomegaly, and an EKG showed atrial fibrillation with a rapid ventricular rate. (Tr.

3

120-21.)

On June 16, 2003, Corbett was seen by Dr. Syed Umer, a cardiologist, for follow-up of his atrial fibrillation, hypertension, and hypercholesterolemia. (Tr. 167.) Corbett denied experiencing any chest pain, shortness of breath, orthopnea, or similar symptoms. (Tr. 167.) Dr. Umer observed that Corbett had trace to 1+ pedal edema and that peripheral pulses were markedly diminished and barely palpable, which he thought may be due to fatty deposition in the lower extremity. (Tr. 168.) He further noted that Corbett was back in sinus rhythm and on a dietary restriction for hypercholesterolemia, and that the hypertension was under reasonable control. (Tr. 168.) Dr. Umer opined that Corbett was stable from a cardiac standpoint and that he had normal ventricular function. (Tr. 168.)

On September 19, 2003, Corbett underwent a consultative physical examination by Dr. Michael Kennedy of Tri-State Occupational Medicine of Indiana. (Tr. 181.) Upon physical examination, Dr. Kennedy noted that Corbett weighed 430 pounds and was almost 5'9" tall, ambulated with a normal gait, had a stable station, appeared comfortable in the seated and supine positions, had no difficulty with squatting or standing on one leg, and had normal strength in his extremities. (Tr. 182-84.) Peripheral pulses were present and symmetrical, and there was no evidence of peripheral arterial insufficiency. (Tr. 183.) Examination of his spine was normal, with normal range of motion. (Tr. 183-84.) A pulmonary function study revealed a mild airway obstruction. (Tr. 187-90.) Dr. Kennedy diagnosed Corbett with asthma, bradycardia, and obesity. (Tr. 184.) He opined that Corbett would be able to work eight hours a day, primarily in a seated position; could stand or ambulate fifteen minutes of an hour; had full use of his arms for grasping, pushing, pulling, or manipulating; could use his legs for operating foot controls; could

work around moving machinery and operate automotive equipment; could perform minimal bending, squatting, and crawling; but could not tolerate extremes of temperature, humidity, or exposure to dust, fumes, or gas. (Tr. 184-85.)

On July 15, 2003, Corbett visited Dr. Geier for a follow-up visit. (Tr. 203.)  Dr. Geier noted that Corbett's wound had completely healed and that his scrotum was normal. (Tr. 203.) He discharged Corbett back to routine activity, noting that a secondary procedure may be necessary in six months. (Tr. 203.)

On October 10, 2003, Dr. B. Whitley, a state agency physician, reviewed Corbett's record and completed a Physical Residual Functional Capacity Assessment. (Tr. 191-98.)  He concluded that Corbett could occasionally lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds; stand and/or walk for about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; never climb; occasionally balance, kneel, crouch, and crawl; and must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. (Tr. 191.)  In reaching his opinion, Dr. Whitley opined that Dr. Kennedy's examination findings and the other medical evidence supported more than the sedentary work restriction given by Dr. Kennedy. (Tr. 197.)  A second state agency physician later affirmed Dr. Whitley's opinion. (Tr. 198.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3).

5

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## V.  ANALYSIS

### A.  The Law

Under the Act, a plaintiff is entitled to SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Corbett is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a

6

severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *See* 20 C.F.R. § 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### *B. The ALJ's Decision*

On September 14, 2006, the ALJ rendered his opinion. (Tr. 10-20.) He found at step one of the five-step analysis that Corbett had not engaged in substantial gainful activity since his alleged onset date and at step two that his asthma and obesity were severe impairments. (Tr. 12-13.) At step three, he determined that Corbett's impairment or combination of impairments was not severe enough to meet a listing. (Tr. 13.) Before proceeding to step four, the ALJ found Corbett's subjective complaints "not entirely credible" (Tr. 16) and assigned him the following RFC:

> [T]he claimant retains a residual functional capacity for a light exertional level, who is limited to unskilled work, who can occasionally bend, squat and crawl, who should avoid concentrated exposure to extreme changes in temperature and humidity, who should not be subjected to exposure to climbing ladders, ropes o[r] scaffolds, unprotected heights, dangerous machinery, and pulmonary irritants, and

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

who should not have any job driving requirements.

(Tr. 17.)

Based on this RFC and the VE's testimony, the ALJ determined at step four that Corbett was unable to perform his past relevant work as a construction worker or contractor. (Tr. 18.) The ALJ then concluded at step five that Corbett could perform a significant number of other jobs within the national economy, including sales attendant (1,700 jobs in the region), sub-assembler (2,200 jobs in the region), and security guard (night watchman-type) (700 jobs in the region). (Tr. 20.)  Therefore, Corbett's claim for SSI was denied. (Tr. 20.)

### C. The Invalidity of Corbett's Waiver of the Right to Counsel Does Not Warrant a Remand Because the ALJ Fully and Fairly Developed the Record

First, Corbett contends that his waiver of the right to counsel was invalid and that the ALJ failed to fully and fairly develop the record.  Specifically, Corbett contends that the ALJ's development of the record was deficient because the ALJ failed to obtain his treatment records from the VA, failed to question Corbett "closely about his obesity," and failed to "develop the issue of Corbett's need to elevate his legs by seeking any further medical source statements." (Opening Br. 9.)  Ultimately, Corbett's argument with respect to his waiver has merit, yet fails to warrant a remand of the Commissioner's decision because the ALJ adequately developed the record.

#### 1. Corbett's Waiver of Counsel

To ensure a valid waiver, the ALJ must explain to a *pro se* claimant "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of fees." *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994); *Thompson*

*v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991).  Here, the ALJ fulfilled the first two requirements through various papers sent to Corbett by the Social Security Administration prior to the hearing and through statements he made to Corbett at the beginning of the hearing. (*See* Tr. 32, 36, 339.) As to the third requirement, though the ALJ did inform Corbett that court approval of fees is required, he failed to explain that the limitation on attorney fees is twenty-five percent of any past due benefits.  Therefore, Corbett's waiver of counsel was invalid. *See Binion*, 13 F.3d at 245 (concluding that the claimant's waiver was invalid because, though the ALJ provided the rest of the required notice, the ALJ failed to explain the twenty-five percent cap to the claimant).

If the ALJ does not obtain a valid waiver, the burden shifts to the Commissioner to show that the ALJ adequately developed the record. *Id*. ("Without the shifting of this burden, no sanction would exist for an ALJ's inadequate explanation of a claimant's rights."); *see also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  Thus, in this instance, the Commissioner, not Corbett, bears the burden of showing that the record was fully and fairly developed.  To adequately develop the record when a claimant is unrepresented, the ALJ must "scrupulously and conscientiously . . . probe into, inquire of and explore for all the relevant facts . . . ." *Binion*, 13 F.3d at 245; *see also Skinner*, 478 F.3d at 841-42; *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).

Once the Commissioner establishes that the record was developed fully and fairly, "the plaintiff has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap." *Binion*, 13 F.3d at 245.  "Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant." *Id*. (citing *Smith v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)).  Nonetheless, courts "generally respect the

9

[ALJ's] reasoned judgment" with respect to how much evidence to gather, *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994), and thus a significant omission is usually required before a court will find that a remand is warranted. *Nelson*, 131 F.3d at 1235. In other words, "the omission must be prejudicial." *Id*.

## 2. Omission of Corbett's VA Records

At the onset of the hearing, the ALJ informed Corbett that he had requested and recently received additional information for Corbett's file, including a medication list, records of recent medical treatment, and a number of medical reports. (Tr. 337-38.) Yet, during his testimony, Corbett told the ALJ, apparently for the first time, that he had been receiving treatment at the VA. (Tr. 349.) Thus, Corbett never identified the VA as one of his health care providers in any documentation to the Commissioner, even though he was invited in the Notice of Hearing to submit additional evidence in conjunction with the hearing. (Tr. 23.)

In any event, once Corbett informed the ALJ during the hearing that he was receiving care from the VA, the ALJ effectively inquired into the treatment that Corbett was receiving there:

> Q    So you go to the VA for treatment now?
>
> A    Yes, sir.
>
> Q    You get your medications from them?
>
> A    Yes, sir.
>
> Q    What else are they doing for you, in terms of the asthma? They're giving you medication. Are they doing anything else for you?
>
> A    I'm on a weight-management program there.
>
> . . . .

10

> Q       Okay. So what other treatment are you getting at the VA?
>
> A       Well, they got me hearing aids, which bothers me. They –
>
> . . . .
>
> Q       So how often do you go to the VA Hospital for treatment?
>
> A       Every month, they give me a blood analysis of my Coumadin and . . . . then, whatever they assign me, I just go do it. . . . I see my doctor about every six months on, you know, on a regular check up but, if I have any trouble, I go in between, you know, visits.
>
> Q       How often do you go in between?
>
> A       Once or twice.

(Tr. 349-50, 354.) Furthermore, after probing into his various impairments and treatment, the ALJ asked Corbett at the close of his testimony: "Is there anything else that you want to tell me about or you want to tell me in more detail about your condition?"; Corbett did not offer any additional medical information in response, simply stating that he wished he could "get [his] life back" and "could have a job." (Tr. 357.) After the VE's testimony, the ALJ again asked Corbett: "Is there anything else you want to tell me before I close the record?"; Corbett responded: "You've been very pleasant, sir. Other than that, I have nothing to say."[4] (Tr. 360.)

The Seventh Circuit Court of Appeals has indeed commented "on the difficulty of having a complete record as one may always obtain another medical examination, seek the views of one

---

[4] In fact, at the beginning of the hearing, the ALJ explained the importance of this final question to Corbett:

> [W]hen I'm finished with the questions that I have or about ready to finish up, I'll ask you a question. The question will be do you have any other physical or any other mental impairments that we haven't discussed or that we need to discuss in greater detail that prevent you from working or affect your day-to-day living activities. That signals to you that I'm about through with my questioning, so if there's anything else that you want to tell me about your conditions, you need to tell me. Otherwise, if it's not in the record, I wouldn't realize it.

(Tr. 340.)

11

more consultant, wait six months to see whether the claimant's condition changes, and so on." *Luna*, 22 F.3d at 692 (citation and internal quotation marks omitted).  As stated *supra*, courts "generally respect the [Commissioner's] reasoned judgment" as to how much evidence to gather. *Id*.  Furthermore, 20 C.F.R. § 416.912(d) provides that before determining that a claimant is not disabled, the Commissioner has the responsibility to develop the claimant's "complete medical history," which is defined as the records of the claimant's medical sources covering "at least the 12 months preceding the month in which [the claimant] file[d] [his] application." *See also Luna*, 22 F.3d at 692-93.  Here, the ALJ requested and obtained all of Corbett's medical records during the twelve months preceding his alleged onset date of May 16, 2003.  Considering all of the foregoing, the ALJ fully and fairly developed the record concerning Corbett's impairments. *See Ryan v. Barnhart*, No. 04 C 0584, 2004 WL 2038848, at *9 (N.D. Ill. Aug. 27, 2004) (finding that the ALJ had adequately developed the record where the claimant identified an additional treating physician at the hearing, and the ALJ inquired in detail about the dates and type of treatment sought from that doctor).

As explained *supra*, once the Commissioner establishes that the record was adequately developed, the plaintiff has the opportunity to rebut this showing by establishing  prejudice or an evidentiary gap. *Binion*, 13 F.3d at 245-46.  Here, Corbett fails to demonstrate how he was prejudiced by this alleged evidentiary gap in the record.  More pointedly, Corbett fails to specifically identify any evidence that the ALJ failed to elicit that would make a difference in the outcome of this case, merely stating that the VA records "*might* explain that he does have a condition that could reasonably be expected to require elevation of the legs." (Reply Br. 2 (emphasis added).)  "Mere conjecture or speculation that additional evidence might have been

12

obtained in the case is insufficient to warrant a remand." *Nelson*, 131 F.3d at 1235 (quoting *Binion*, 13 F.3d at 246).

In fact, by the time Corbett filed his request with the Appeals Council to review the ALJ's decision, he had obtained counsel to represent him. (*See* Tr. 6.)  Yet, his counsel never sought to submit Corbett's VA records to the Appeals Council or advocate to the Court for a sixth sentence remand to consider the "new" evidence.  Indeed, a claimant who is represented by counsel is assumed to have advanced his "strongest case for benefits." *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987).  Thus, Corbett's argument that a remand is required because the ALJ failed to obtain his VA records is unpersuasive.

### 3. Evidence of Corbett's Obesity

Corbett's argument that the ALJ failed to adequately develop the record with respect to his obesity is similarly unconvincing.  Corbett contends that the ALJ failed to "question [him] closely about his obesity," such as inquiring where his excess weight is carried and how that might affect his ability to stand, walk, lift, and carry. (Opening Br. 9.)   Contrary to Corbett's assertion, the ALJ adequately questioned Corbett about how his obesity affects his physical capacity:

> Q     Do you have difficulty bending or anything like that [as a result of your obesity?]
>
> A     Yes, sir.
>
> Q     What other activities are impaired by the obesity? Climbing? No climbing?
>
> A     Yeah.  I'm afraid of heights . . . .  I didn't used to be but if I fall now, I'm done.  I mean, if I break a leg or a hip, I'm done.  I mean, I don't --

(Tr. 355.)  Moreover, the ALJ asked Corbett about the treatment he was receiving for his obesity at the VA:

    A    I'm on a weight-management program there.

    Q    How tall are you right now?

    A    5'10", 5'11".

    Q    And how much do you weigh?

    A    406 pounds.

    Q    And have you lost weight?

    A    Since before the surgery, because I dropped because I was sick right before there, over 100 pounds, sir.

    Q    Okay. So are you going to continue to lose weight?

    A    I'm going to try so I can live to see tomorrow.

(Tr. 350.) Furthermore, as explained *supra*, the ALJ asked Corbett at the close of his testimony and again at the close of the VE's testimony whether there was anything else that he wanted the ALJ to know about his condition, yet Corbett failed to offer any additional information.

In sum, the ALJ adequately developed the record concerning Corbett's obesity. In fact, the ALJ credited the limitations grounded in Corbett's obesity in the RFC, limiting him to jobs that require only occasional bending, no climbing, and no exposure to heights. Moreover, Corbett utterly fails to point to any specific evidence that demonstrates how he was prejudiced by any alleged evidentiary gap in the record concerning his obesity. *See Binion*, 13 F.3d at 245-46; *Nelson*, 131 F.3d at 1235.

### 4. Corbett's Alleged Need to Elevate His Legs

Finally, Corbett asserts that the ALJ failed to "develop the issue of his need to elevate his legs." (Opening Br. 9.) Despite Corbett's contention, the ALJ adequately questioned Corbett about his alleged need to elevate his legs:

14

> Q	What problems do you still have as a result of the high blood pressure, even when you take your medication?
>
> A	Swelling. I still get . . . swelling because it, I don't know what causes the swelling when I still take it but I still get swelling.
>
> Q	Where do you swell up at?
>
> A	Beg your pardon?
>
> Q	Where is the swelling? What part of your body?
>
> A	My knees, my ankles, my legs. Sometimes my upper thigh, it gets, you know, so bad. It gets up in my upper thigh.
>
> Q	How often does that happen to you, the swelling?
>
> A	Every day.
>
> Q	Every day?
>
> A	Every day.
>
> Q	Is it affected by your physical activities. For instance, if you do certain things, you're going to swell more than others?
>
> A	If I'm on my legs any long period of time, yes.
>
> Q	Okay.
>
> A	Sometimes, through the day, I have to lay down in the middle of the afternoon and relax enough that swelling goes down in my legs. It lets the blood circulate through my body. You understand what I'm saying?
>
> Q	Yeah.
>
> A	So it's not all gathered in my legs. I have to raise them up level with my heart and the swelling will go down.

(Tr. 353-54.) Furthermore, as explained *supra*, the ALJ asked Corbett at the close of his testimony and again at the close of the VE's testimony whether there was anything else that he wanted the ALJ to know about his condition, yet Corbett failed to offer any additional

15

information.  Thus, the ALJ adequately developed the record concerning Corbett's alleged need to elevate his legs.

Moreover, Corbett's contention that he was prejudiced by the ALJ's failure to obtain a medical source opinion from the VA concerning his alleged need to elevate his legs is unconvincing.  Corbett's suggestion that a medical source opinion "might explain that he does have a condition that could be reasonably expected to require elevation of the legs" (Reply Br. 2) is mere speculation and thus insufficient to warrant a remand.  *Nelson*, 131 F.3d at 1235.  As stated *supra*, Corbett's counsel never sought to submit a medical source statement from the VA to the Appeals Council concerning Corbett's alleged need to elevate his legs, and a claimant who is represented by counsel is assumed to have advanced his "strongest case for benefits." *Glenn*, 814 F.2d at 391.  Thus, Corbett's argument that a remand is required because the ALJ failed to adequately develop the record concerning his alleged need to elevate his legs is unsuccessful.

In sum, though Corbett's waiver of the right to an attorney was invalid, it amounts to no more than harmless error, *see Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000), as the ALJ fully and fairly developed the record, exploring all the relevant facts. *See Binion*, 13 F.3d at 246.  Consequently, Corbett's first argument fails to warrant a remand of the Commissioner's final decision.

### D.  The ALJ's Evaluation of the Opinion of Dr. Kennedy, an Examining Physician, Is Supported by Substantial Evidence

Corbett next argues that the ALJ improperly evaluated the opinion of Dr. Kennedy, an examining physician, stating that "he failed to explain why he gave little weight to [his] opinion, especially in light of the fact that he was an examining physician." (Opening Br. 9-10.)  Corbett's argument is ultimately unavailing.

16

The Commissioner must "evaluate every medical opinion [it] receive[s]." 20 C.F.R. 416.927(d).  Each medical opinion, other than a treating physician's opinion that is entitled to controlling weight, must be evaluated pursuant to the following factors in order to determine the proper weight to apply to it: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 416.927(d); *see generally White v. Barnhart*, 415 F.3d 654, 658-60 (7th Cir. 2005).

Here, the ALJ thoroughly considered Dr. Kennedy's evaluation, including his opinion that Corbett could perform sedentary work. (*See* Tr. 17.)  Nonetheless, the ALJ ultimately assigned an RFC, which is a determination reserved to the Commissioner, *see* SSR 96-5p, that coincided with the less restrictive limits assigned by the state agency physicians. *See generally* 20 C.F.R. § 416.927 (f)(2)(i) (stating that "[s]tate agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation").  Indeed, the ALJ is required to weigh such conflicting medical evidence and ultimately decide which evidence to believe; this Court does not resolve evidentiary conflicts. *Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (emphasizing that when reviewing the decision of an ALJ, the court may not "reweigh evidence, *resolve conflicts in the record*, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner" (emphasis added)).  "Merely because the ALJ did not adopt all of [Dr. Kennedy's] recommendations does not lead this Court

17

to conclude that the ALJ failed to consider the doctor's opinion[] properly." *Connour v. Massanari*, 173 F. Supp. 2d 785, 797 (N.D. Ill. 2001).

Furthermore, the Court can trace the ALJ's path of reasoning with respect to the ALJ's consideration of Dr. Kennedy's opinion. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (stating that an ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that [he] considered the important evidence and . . . to enable us to trace the path of [his] reasoning"). The ALJ found Dr. Kennedy's opinion inconsistent with the opinion of Dr. Whitley, who reviewed Corbett's entire file and expressly opined that he thought Dr. Kennedy's examination and the other medical evidence of record would support more than the sedentary work, and the opinion of Dr. Geier, who stated that Corbett's abscess was completed healed and discharged him back to routine activity. (Tr. 17, 197); *see* 20 C.F.R. § 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Thus, the ALJ considered various relevant factors under 20 C.F.R. § 416.927(d) when assessing the limitations assigned by Dr. Kennedy, including the consistency of the record as a whole, that Dr. Kennedy examined Corbett one time, and that Dr. Whitley reviewed Corbett's entire record. *See* 20 C.F.R. § 416.927(d)(1), (4), (6).

In sum, the ALJ sufficiently built an accurate and logical bridge between the evidence of record and his conclusion with respect to Dr. Kennedy's opinion. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) (collecting cases that state an ALJ is required to build an accurate and logical bridge between the evidence and his conclusion so that a court may afford the claimant a meaningful review). Thus, Corbett's second argument fails to warrant a remand of the Commissioner's decision.

18

### E.  The ALJ's Error in Failing to Ask the VE Whether His Testimony Was Consistent
### With the DOT Was Ultimately Harmless and Does Not Necessitate a Remand

Finally, Corbett contends that although the ALJ recited in his decision that the VE stated his testimony was consistent with the DOT, the VE never gave such testimony.  Corbett contends that this error by the ALJ necessitates a remand.

Indeed, Social Security Ruling 00-4p states that "[w]hen a VE . . . provides evidence about the requirements of a job or occupation, the [ALJ] has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT." *See also Prochaska v. Barnhart*, 454 F.3d 731, 735-36 (7th Cir. 2007).  Here, the ALJ failed to do so.  The Commissioner, however, argues that the ALJ's omission is ultimately harmless, as 3,900 of the 4,600 jobs identified by the ALJ that Corbett could perform were, in fact, consistent with the DOT. (Mem. in Supp. of the Commissioner's Decision 18.)

To elaborate, the ALJ found at step five that Corbett was not disabled because he could perform the following three jobs identified by the VE at the hearing: sales attendant, DOT # 299.677-101 (1,700 jobs in the region), sub-assembler, DOT # 729.687-010 (2,200 jobs in the region), and night watchman DOT # 372.667-038 (700 jobs in the region).  Corbett and the Commissioner agree that these three jobs require light exertion, which is consistent with Corbett's RFC; that the jobs of sales attendant and sub-assembler are consistent with unskilled work, which is consistent with Corbett's RFC; and that the job of night watchman constitutes semi-skilled work, which is inconsistent with Corbett's RFC. (Mem. in Supp. of the Commissioner's Decision 18; Reply Br. 4.)  Thus, according to the parties, their dispute essentially boils down to whether the 1,700 sales attendant jobs and the 2,200 sub-assembler jobs together constitute a "significant number" of jobs for an ALJ's step-five finding. (Mem. in Supp.

19

of the Commissioner's Decision 18; Reply Br. 4.)

It is evident that a remand is unnecessary to resolve this issue, as the Seventh Circuit Court of Appeals has specifically held that 1,400 jobs, that is, an amount far less than 3,900, constitutes a "significant number" of jobs with respect to an ALJ's step-five finding. *See Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (collecting cases); *see also Humphries v. Apfel*, No. 99 C 1200, 2000 WL 204234, at *11 (N.D. Ill. Feb. 11, 2000) (collecting cases).  Returning this case to the ALJ for another opinion on the current record would simply be an exercise in formality. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").  Therefore, Corbett's final argument in pursuit of a remand is unavailing.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Corbett.

SO ORDERED.

Enter for this 5th day of March, 2008.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

20